## Davis v. Dean et al.

(Decided October 10, 1930.)

R. L. BRONAUGH for appellant.

W. J. BAXTER for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

On January 21, 1926, C. M. Dean and his mother, Ella F. Dean, executed a note to appellant, M. S. Davis, for $2,210, payable ten months after date. This was in renewal of a note executed by C. M. Dean to Davis some years before. On October 24, 1927, Davis obtained judgment against Ella F. Dean on the note. He had execution issued, which was levied on a house and lot in Nicholasville in which she resided. On December 7, 1927, he filed this action against Ella F. Dean, C. M. Dean, Carter Sellers, and Mary A. Sellers, his wife, charging that on January 11, 1927, Ella F. Dean, with fraudulent intent to cheat and delay her creditors and defeat him in the collection of his debts against her, had conveyed to Carter Sellers and his wife, Mary A. Sellers, the house and lot referred to, reserving to herself the right to occupy the property as a home for and during her natural life. He

prayed that the conveyance be adjudged fraudulent and the property subjected to his debt. The allegations of the petition were denied, proof was taken, and on final hearing the circuit court dismissed Davis' petition. He appeals.

The facts shown are these: Mary A. Sellers is a sister of C. M. Dean and a daughter of Ella F. Dean. Harvey Dean, the husband of Ella F. Dean, died in the year 1917, leaving surviving him his widow, Ella F. Dean, and two children, C. M. Dean and Mary A. Sellers. He owned at his death a small amount of personal property and about 160 acres of land near Camp Dick Robinson in Garrard county, Ky. By agreement of parties no administrator was appointed. C. M. Dean and Carter Sellers undertook to settle the estate by agreement of parties. They divided the personal property setting apart to Mrs. Dean $750 out of it. Mary A. Sellers sold to C. M. Dean her interest in the farm for $13,000, excluding her interest in the dower. After this and before any deed was made C. M. Dean sold the farm to another for $56,000, and by agreement of parties three notes each of $6,622.-22 were turned over to the widow with the agreement that she was to have the interest on the money as long as she lived, and that at her death the principal was to be equally divided between Mary A. Sellers and C. M. Dean. On October 1, 1918, Ella F. Dean bought of Hattie B. Lear and her husband the house and lot in Nicholasville, above named, for $3,000, and it was conveyed to her by them, she paying the consideration by borrowing the money, part of which she afterwards paid out of her income from the sale of her husband's farm. On January 2, 1928, C. M. Dean got from his mother, Ella F. Dean, one of the notes for $6,222.22, under a written contract reciting that the note was the property of Ella F. Dean for her natural life, and at her death was to be divided equally between C. M. Dean and Mary A. Sellers, and it was stipulated that, in the event of the death of Ella F. Dean before his note was paid, his share of the note or any other money coming to him at the death of his mother be first used to satisfy his note. This agreement was made with the consent of Mary A. Sellers and her husband. On January 2, 1927, he executed to his mother a note for $6,645.22 for the land note and interest. In the meantime she had indorsed other paper for him which she had had to pay, amounting to $4,900, and on January

12, 1927, he executed a note to her for this amount. The two notes amounted to $11,545.22, which was more than his one-half interest of the amount of the land notes given to his mother for life. Sellers and wife and C.M. Dean and the mother then had a meeting in which the mother turned over to Sellers and wife the Liberty bonds she then had, which she had bought by cashing one of the land notes, amounting to $5,800. She paid a note for Mrs. Sellers amounting to $1,900, also another for $100, and conveyed to them the house and lot for which she paid $3,000, but which they say was not then worth over $2,000. All this putting the land at $2,000 amounts to $9,800. This stripped her of all her property. On the other hand, this settled Mrs. Sellers' claim against her for one-half of $18,666.66, and also settled the balance of a note for $600 that Mrs. Dean owed Carter Sellers, making in all $9,933.33. Appellees insist that the mother was then indebted to Mrs. Sellers in the sum of $11,545.-22, because she had let C. M. Dean have this amount, and it was the verbal agreement between them at the time of the division of the estate that, if the mother let either of the children have any money out of her share, the other was to be made equal with that person. They so testified, but this agreement was not put in writing. C. M. Dean was insolvent at the time the deed was made. The mother was seventy-four years old and under the mortality table her life estate in the fund was of value 33.11 per cent. of the principal in her hands. Mrs. Sellers was not entitled to demand from her mother any part of the principal as long as she lived, unless under the verbal agreement, which had never been acted upon by the parties in any way until Davis was seeking the payment of his debt.

While Sellers and C. M. Dean state that the Liberty bonds were turned over absolutely, Sellers states that she gets the interest on these bonds; his wife gives it to her and Mrs. Sellers in substance makes a similar statement. Mrs. Dean also testified that the agreement was that she was to sell Mrs. Sellers the property for her to take care of her and see after her. She says:

"I sold her the property and let her see after me and take care of me and she gives me money when I need it." She also said: "As I was owing her and the estate was to pay her, her amount had to go to her and I thought it was my duty to sell it

to her and let it go as far as it would, as Charley was willing and his wife was willing and I am in hopes there is no hard feelings anywhere else."

Sellers and wife were living on an adjoining lot. Mrs. Dean pleads she had a homestead in the property, but it is not alleged or proved that she is "an actual bona fide housekeeper with a family." So far as appears she has no family and was not entitled to a homestead. Ellis v. Davis, 90 Ky. 183, 14 S. W. 74, 11 Ky. Law Rep. 893.

The question presented is: Could Mrs. Dean strip herself of all her property and thus provide for her daughter, leaving her debts unpaid? While Mrs. Dean might be willing to equalize her daughter with her son, she could not turn over to her daughter all of her property and leave unpaid her debts. Even if the parol agreement was made, as charged, it was never recorded. Her creditors had no notice of it, and it created no lien on the property in the hands of Mrs. Dean. The land stood in her name absolutely. So did the Liberty bonds. A parent cannot in his lifetime strip himself of all his property in order to equalize his children, and leave his debts unpaid. The fact that the mother had signed the son's notes as his surety and had had to pay the notes, gave the mother a cause of action against the son for the amounts so paid for him; but this fact did not entitle the daughter in the mother's lifetime to strip the mother of all the property she had and leave her with nothing to live on. The purpose of the parol agreement was to provide for the mother as long as she lived. It naturally referred to the property held by the mother for life, and meant that, at the death of the mother, the daughter was to be made equal with the son before he received anything further. The parties had never placed any other construction upon it, for soon after it was made the son got from his mother the note for $6,222.22. In addition to this, in view of the admitted subsequent conduct of the parties, it is hard to escape the conclusion that Mrs. Dean is correct when she says that her daughter was to see after her and take care of her, and that this was the consideration of the agreement; for it is incredible that the son and daughter took from the mother everything she had, intending to leave her penniless, without any means of support, when it is admitted that they have since given her the interest on the Liberty bonds. In

366

Hawkins v. Moffit, 10 B. Mon. 83, the court thus stated the rule as to such a transfer: "A debtor cannot be permitted thus to dispose of his estate to the hindrance and delay of his creditors. To sanction such contracts, would be virtually declaring that by agreements for future boarding, clothing, &c., for a term of years, long enough to exhaust all the debtor's property, almost every creditor may be precluded from coercing the collection of his demands." To the same effect see Morton v. Young, 173 Ky. 301, 190 S. W. 1090; Walker v. Williamson, 177 Ky. 599, 198 S. W. 10; 27 C. J. p. 530, 571.

While the rule is that this court will not disturb the finding of the chancellor on the facts where the mind is left in doubt as to the truth, this rule is not applied where the mind is not left in doubt as to the truth. On the whole record it is clear here that the transaction in question was simply an effort on the part of Mrs. Dean to equalize her daughter with her son.

Judgment reversed, and cause remanded for a judgment as above indicated.